UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

IRON PARTNERS, LLC,

        Plaintiff,

        v.

DAMES & MOORE, a California limited
partnership, URS CORPORATION, a
Nevada corporation, and URS HOLDINGS,
INC, a Delaware corporation,

        Defendants.

_____

DAMES & MOORE, a California limited
partnership, URS CORPORATION, a
Nevada corporation, and URS HOLDINGS,
INC, a Delaware corporation,

        Third Party Plaintiffs,

        v.

OREGON IRON WORKS, INC., an Oregon
corporation,

        Third party Defendant

Case No. C07-5643RBL

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendants Dames & Moore, URS Corporation, and URS

Holdings' [Together "D&M"] Motion for Summary Judgment [Dkt.#39]. Plaintiff Iron Partners LLC is the current owner of contaminated property. Its Complaint alleges that Defendant D&M is liable to it for negligently failing to discover and disclose the contamination when it performed an environmental assessment for a prior owner in 1989. D&M argues that its Reports were not inaccurate as a matter of law, and that it owed no duty to Plaintiff and that Plaintiff had no right to rely on the reports it prepared for someone else.

For the reasons discussed below, the Motion is GRANTED and the Plaintiff's claims against D&M are DISMISSED WITH PREJUDICE.

**A**.     **Facts.**

The case arises out of environmental contamination on a parcel of land near Vancouver, Washington. Most of the facts are undisputed and well-documented.

The parcel is known as parcel 49, and is part of the Columbia Business Center. At the time Defendant D&M was involved with the Property, the 248 acre Columbia Business Center was owned by Hillman Properties Northwest. Oregon Iron Works leased a portion of the Center from Hillman, known as Parcel No. 48, which has a building on it. Adjacent to Parcel 48 is Parcel 49, which was and apparently is unimproved. The contamination at the center of this lawsuit, in the form of a debris field dating to World War II, is on Parcel 49. Oregon Iron Works ("OIW") operated a steel fabrication business in the Parcel 48 Building. Together, Parcels 48 and 49 comprise what the parties now call the "OIW Site."

Sometime prior to May, 1989, Hillman approached and hired D&M, an environmental engineering firm, to perform environmental assessments on the Columbia Business Center. On May 25, 1989, D&M issued its "Phase I Property Transfer Assessment." [See Ex. 1 to the Barhoum Dec., Dkt. #51.]

On September 12, 1989, D&M issued its "Final Report Phase II Site Characterization," which D&M describes as the "Hillman Report." [See Ex. A. to the Carmalt Dec., Dkt. #41]. Both reports related to the entire Columbia Business Center site, and the Phase II report necessarily incorporated and was based in part

on the recommendations outlined in the Phase I Report. Both Reports were prepared for the exclusive use of, and paid for by, the Property owner, Hillman. D&M alleges, without contradiction, that the purpose of the reports was to assist Hillman's efforts to refinance the Columbia Business Center, and to that end, to satisfy CERCLA's innocent purchaser provisions.

In December, 1990, OIW approached Hillman about purchasing parcels 48 and 49. Negotiations ensued and culminated in a July 29, 1991 Purchase and Sale Agreement. [See Ex. C to Carmalt Dec.; Dkt. #41] Hillman informed D&M that it was selling parcels 48 and 49 to OIW, and asked D&M to provide a copy of the Phase II Hillman Report[1] to OIW. [See Ex. E to Carmalt Dec,, Dkt. #41].

OIW discussed with D&M the possibility of conducting a supplemental assessment on the OIW Site. D&M prepared and submitted a proposal to OIW, which advised taking soil samples from Parcel 49 and other additional field sampling. [See Ex. F to Carmalt Dec., Dkt. #41]. OIW modified the proposal, deleting the field sampling "tasks" and their associated costs, and signed the proposal.

D&M performed the revised scope of work, and issued a "Preliminary Site Assessment for Parcels 48 and 49" on October 22, 1991. (The "OIW Report") [See Ex. J to Carmalt Dec., Dkt. #41]. The OIW Report made various recommendations about further investigations, including specifically that the "black stained surface soil on Parcel 49 be characterized and removed." OIW[2] did not authorize D&M to conduct this further field work.

In late November 1991, OIW assigned its right to purchase the OIW Site from Hillman to a general partnership consisting in part of two OIW officers– President Terry Aarnio and Vice President Robert Beal. [See Ex. K to Carmalt Dec., Dkt. #41]. D&M asserts that it was not aware of this assignment, and that its

---

[1] Iron Partners LLC's claims relate to and rely primarily on, the Phase I report it now claims it sought and received prior to closing. D&M points out the lack of evidence supporting the assertion that Iron Partners LLC or its predecessor ever saw, or relied upon, any specific portion of the Phase I Report.

[2] D&M provides copies of this report which were apparently annotated by various OIW managers, including Vice President Robert Beal. [See Exs. G, H, and I to the Carmalt Dec., Dkt. #41]. These annotations suggest that OIW determined not to proceed with additional testing due to the cost.

standard practice was and is to limit the use of its reports to the parties to the contract under which they perform the work. Indeed, they argue, they do sometimes issue "Reliance Letters" to third parties, provided the third party agrees to be bound to the Terms and Conditions limiting D&M's liability. [See Marcus Declaration, Dkt. #40.] It is apparently undisputed that Iron Partners general partnership did not seek or obtain a Reliance Letter from D&M.

Iron Partners' purchase of the OIW Site was completed, and OIW leased the site back from Iron Partners for at least the next 14 years. Apparently, hazardous substances, in the form of a buried, 16,000 square foot debris field dating to World War II, were discovered on parcel 49 in April, 2005. Iron Partners LLC was formed in 2006, and ownership of the OIW site was transferred from the general partnership to the LLC.

Iron Partners LLC commenced this litigation against D&M in 2007. It asserted negligent misrepresentation and negligence claims, alleging that D&M's reports, including the Hillman Report and the OIW Report, contained misrepresentations. Iron Partners' operative, Second Amended Complaint [Dkt. #36] omits reference to the OIW Report and references instead only the Hillman Report.

D&M moves for Summary Judgment on both claims, arguing that its reports contained no misrepresentations. It also argues that, as a matter of law, Iron Partners LLC's predecessors did not rely, and did not have the right to rely, on its reports as the basis for its alleged conclusion that the OIW site was free from the sort of environmental contamination it discovered in 2005.

Iron Partners LLC's Response focuses not on the Hillman report or the OIW Report, but instead relies solely upon on the earlier, Phase I report prepared by D&M in May 1989. It argues that the Report contains two factual misrepresentations: that it was prepared in accordance with industry standards, and that the "Property" [Parcel 49] was free from contamination. It urges the court not to make factual rulings as to reliance and foreseeability in the context of a summary judgment motion.

D&M replies that the Phase I report does not contain any representation that Parcel 49 was free from

contamination, and that there is no admissible evidence supporting the allegation that Iron Partners even saw the Phase I environmental assessment. It argues there is no evidence that Iron Partners relied on that Phase I Report, rather than upon the later Hillman and OIW Reports it indisputably received.

### B.    Summary Judgment Standard

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

### C.    Plaintiff's Negligent Misrepresentation claims are insufficient as a matter of law.

A plaintiff claiming negligent misrepresentation must prove by clear, cogent, and convincing evidence that (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages. *See Ross v. Kirner*, 162 Wash.2d 493, 172 P.3d 701, 704 (2007). An omission alone cannot constitute negligent misrepresentation, since the plaintiff must justifiably rely on a misrepresentation. *Id.*

As articulated in its Summary Judgment Response [Dkt. #48], Plaintiff's negligent misrepresentation claim is now based on two alleged misrepresentations: (1) that D&M's Phase I report was done in accordance with industry standards, and (2) that the Phase I Report stated that there was no environmental contamination on Parcel 49.

As to the former, Plaintiff's sole evidence that the Phase I report was not done in accordance with industry standards is the Declaration of an expert, Patrick Brady, who states only that "D&M should have discovered the buried debris and identified it in the Phase I report," and "I do not believe D&M performed the work in accordance with generally accepted environmental science practices[.]" Neither of these statements is explained or supported.[3] Mr. Brady makes no effort to identify what the standards were at the time the work was done, or to explain how D&M's work failed to meet them.

D&M argues that Mr. Brady's Declaration is insufficient to create a question of fact as to the falsity of the statement that the Phase I Report was done in accordance with industry standards, and that Iron Partners has not in any event demonstrated that it relied on the statement, or that its reliance was the proximate cause of any loss.

As D&M points out, such a conclusory statement is not enough to establish a factual proposition for purposes of summary judgment. *See, for example, Theonnes v. Hazen*, 37 Wn. App. 644, 648 (1984). Plaintiff's negligent misrepresentation claim, based on the alleged failure to follow industry standards, is insufficient as a matter of law, and D&M's Motion on this point is GRANTED.

The heart of Plaintiff's claim is its second assertion, that the Phase I Report falsely represented that Parcel 49 was free from environmental contamination. As an initial matter, the Phase I Report attached to

---

[3]Mr. Brady also claims that the actual Parcel 49 field testing D&M twice recommended to OIW (which followed the Phase I work, and which OIW twice declined) "would not have discovered the buried debris located [there]." Neither he nor Iron Partners attempts to reconcile their simultaneous, inconsistent claims that a Phase I environmental assessment "should have" disclosed the buried debris field, while actual sampling on the specific site "would not have" discovered it.

the Barhoum Declaration does not, in its 290 pages, affirmatively assert that Parcel 49 (or any other portion of the Columbia Business center) is "free from environmental contamination." Instead, it is an evaluation of potential environmental risk associated with the property. This involved (1) review of maps and photographs, records, public files, and regulations; (2) "site reconnaissance," including observance of property grounds, tank locations, and structures; interviews of those (like OIW) familiar with the site, its usage and history; documentation of visible evidence of disposal, spills, or questionable management practices; and observation and visual classification of adjacent property use; and (3) preparation of the Phase I Report. [See Phase I Report, Ex. 1 to Barhoum Dec., Dkt. #51, at p. DM 00286]. D&M did not undertake to do any sampling or field testing in its Phase I Report, an omission which is fully consistent with the nature of Phase I environmental assessments generally.

In an effort to avoid the fact that the Phase I Report does not contain the misrepresentation upon which its case necessarily relies, Iron Partners[4] asserts that the enumeration of some likely environmental contamination on the Columbia Business Center amounts to an affirmative representation that the remainder has no contamination. [See Dkt. #48 at p. 7] It claims that "this is not a failure to disclose case" [See Dkt. #48 at p. 9], apparently recognizing that an omission, rather than a statement of existing fact, cannot support a negligent misrepresentation claim under Washington law. *See Ross*, 162 Wash.2d at 499.

Iron Partners relies only upon an unreported, distinguishable, Tennessee Appellate Court opinion, *Watco v. Pickering Environmental Consultants, Inc.*, 2007 WL 1610093 (Tenn. Ct. App. 2007), for the proposition that a Phase I which fails to identify all possible environmental contamination constitutes an affirmative representation that there is no such contamination. This citation and this argument is not

_____

[4]It is not at all clear that Iron Partners LLC or its predecessors ever received, read, or relied upon the Phase I Report, regardless of its contents. As D&M points out, there is no admissible evidence in the record that they even saw the report, and Iron Partners' primary "reliance" witness, Robert Beal, does not testify that he read or relied on the Phase I Report specifically. Instead, he claims reliance on "*the environmental reports* prepared by D&M," of which there are at least three, including one prepared for OIW directly, which recommended additional field testing and sampling on Parcel 49.

persuasive.

The gist of Plaintiff's complaint (or, more accurately, its argument in response to summary judgment) is that the Phase I Report failed to discover and disclose environmental contamination buried on Parcel 49. The Report does not say, and does not purport to say, that any portion of the Columbia Business Center which is not mentioned in the Phase I report is necessarily free from environmental contamination. The Plaintiffs therefore cannot, as a matter of law, establish the first element of their negligent misrepresentation claim: that the defendant supplied false information to them.

The Plaintiff's negligent misrepresentation claim fails for additional reasons. Much of the parties' briefing is devoted to the issue of Iron Partners' reliance, and its right to rely, on the Phase I report.

Viewing the facts in the light most favorable to the plaintiff, the documentary evidence establishes that, at Hillman's request, D&M provided some portion of the reports it authored to OIW. There is no evidence that D&M knew or should have known that Iron Partners general partnership would or did purchase the property at all, much less that it would rely on the report D&M prepared for Hillman and agreed to show OIW. The Report specifically states that it is for the exclusive use of Hillman (the entity which paid for it) and expressly disclaims any liability for others' reliance on it. Significantly, it also expressly states that it is "neither a rejection nor an endorsement of the Property."

Furthermore, OIW specifically disclaimed any reliance on Hillman or its agents in its purchase agreement with Hillman, and conditioned its obligation to purchase on its own satisfaction with any additional environmental assessments. [See Ex. D to Carmalt Dec.; Dkt. #41]

Indeed, OIW itself engaged D&M to conduct just such an additional environmental assessment. [See Ex. F to Carmalt Dec., Dkt. #41] D&M's proposal included soil sampling, and OIW chose not to pay D&M to do that work.

D&M's subsequent "Update" to the Phase I Report (the "OIW Report") discovered and disclosed

"high metal concentrations in black sands on Parcel 49," and bluntly stated: "the potential for significant environmental impairment of the Building 48 [where OIW had been operating its steel business] and Parcel 49 is moderate." It again recommended that "the black stained surface soil in the Parcel 49 be characterized and removed." [See Ex. J to Carmalt Dec., Dkt. #41]. OIW did not follow up on this recommendation, and instead assigned its purchase right to the Iron Partners general partnership, which proceeded with the purchase.

It is therefore undisputed that, prior to the closing of the Hillman sale to Iron Partners, D&M twice recommended to OIW that the site undergo soil sampling, and OIW twice elected not to do so. It was told in plain language that there was a moderate risk of significant environmental contamination on the site. Under these circumstances, the court cannot conclude that Iron Partners had a right to rely, or that it did rely, on the prior Phase I report for the proposition that the property was in fact free from environmental contamination. Iron Partners cannot establish the "reliance" elements of its negligent misrepresentation claim as a matter of law, and D&M's motion for summary judgment on this claim is GRANTED.

**D.** **If and to the extent Plaintiff's negligence claim is independent of its negligent misrepresentation claim, it is insufficient as a matter of law.**

Plaintiff Iron Partners also alleges a common law negligence claim against D&M. It is not clear that this claim differs in any meaningful way from the negligent misrepresentation claim discussed and dismissed above.

Under Washington law, a negligence claim has the following elements: The existence of a duty owed to the complaining party; (2) a breach thereof; (3) a resulting injury; and (4) a proximate cause between the claimed breach and resulting injury." *Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 (1984).

For the reasons discussed above, D&M owed Plaintiff no duty, and the record does not establish any breach even if it did. Nor can Plaintiff establish the required proximate cause, given the undisputed fact that

it was told of the risk of environmental contamination prior to closing, and elected not conduct the recommended soil sampling. Under these facts, the Plaintiff's negligence claim similarly fails as a matter of law, and Defendant's Motion on this point is GRANTED.

### E. The Economic Loss Rule Applies.

Finally, even if the Plaintiff's negligence based claims were cognizable, the economic loss rule would bar their claims for purely economic loss. "Where parties have entered into a contractual relationship, and merely economic losses occur, the economic loss rule bars the complaining party from asserting tort remedies." *Stieneke v. Russi*, 145 Wn.App. 544, 190 P.3d 60 (2008) (contract bars claim for negligent misrepresentation). "Instead, the party is limited to the contract remedies that the parties bargained for and agreed upon." *Id.*

While D&M denies that it had a contractual or other relationship of any sort with Iron Partners LLC, it is undisputed that it did have a contractual relationship with OIW, relating to the Phase I "Update," or "OIW Report." Plaintiff's effort to disavow the terms of this contract, including the limitation on liability, and to rely solely on the Phase I Report, are not effective. Plaintiff's position is that because it is a remote third party, it is not bound by the terms of the Hillman/D&M contract, and is instead in a better position than Hillman would have been *vis a vis* that Phase I report. It also claims that it was not a party to the proposal D&M made to OIW, which similarly included a limitation on liability, and that it is therefore not bound by that agreement, either.

These positions are not supported, and are not supportable under Washington law. The economic loss rule would bar Plaintiff's tort claims, even if those claims were otherwise viable.

### F. Conclusion.

Plaintiff's claimed reliance on the 1989 Phase I Report D&M prepared for a prior owner is misplaced as a matter of law. Holding that Iron Partners could ignore the Phase II Hillman Report, and

ORDER
Page - 10

the OIW Report it commissioned, and sue the author of the initial Report, would be holding an environmental engineering firm strictly liable for filing to discover ALL environmental contamination any time they are in any way involved in assessing the site, regardless of what further investigation they recommend, and regardless of what further information they provide. Iron Partners did not pay D&M to indemnify it for any contamination that might be discovered, and D&M did not undertake to do so. Plaintiff's negligence claims against D&M are not supported by logic or the law. The Defendant's Motion [Dkt. #39] is GRANTED and Plaintiff's claims are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

      Dated this 8th day of June, 2009.


RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE